IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

EQUAL EMPLOYMENT OPPORTUNITY )
COMMISSION,                  )
                             )
            Plaintiff,       )
                             )
      vs.                    )    Case No. 8:12-CV-02772-MSS-EAJ
                             )
AMERICAN TOOL & MOLD, INC.,  )
                             )
            Defendant.       )
                             )
_____)

## PLAINTIFF EEOC'S CASE DISPOSITIVE MOTION FOR SUMMARY JUDGMENT
[*Memorandum of Law Incorporated Herein*]

Pursuant to Fed. R.Civ. P. 56 and based on the undisputed material facts and attached exhibits which are incorporated herein, Plaintiff U.S. Equal Employment Opportunity Commission ("EEOC") respectfully requests that the Court grant summary judgment against Defendant American Tool & Mold, Inc. ("ATM") on the merits of EEOC's claim under the Americans with Disabilities Act, 42 U.S.C. §12102, *et seq.* ("ADA")*,* as amended, and with respect to ATM's conciliation and qualification based affirmative defenses.[1]

## I.  SUMMARY OF THE ARGUMENT

ATM violated the ADA when it withdrew Michael Matanic's job offer in 2010 based on its perception that an old back impairment could potentially lead to liability for on-the-job injuries. ATM's decision was based, in part, on its contracted occupational medical clinic's decision that Matanic was "not fit" for work because he failed to provide a statement from a

---

[1] EEOC incorporates by reference its Appendix of Exhibits in Support of its Motion for Summary Judgment and will refer to those Exhibits as "Pl. Ex. ___." Depositions transcripts, although also Plaintiff's exhibits, are identified by the name of the deponent for ease of reference, *i.e.,* (*Gwyn* page : lines) or, where multiple pages are at issue, (*Gwyn* page : lines – page : lines), thus,, (*Gwyn* 46:20-22; 48:15-25; 49:1-9; 49:19-51:4).

physician, who performed back surgery on him in 2003, stating that he had no "permanent restrictions." There is no dispute that Michael Matanic's job at ATM required physical labor, that Matanic was healthy and suffered from no back problems and that he actually performed the essential functions of his position between November, 2009 and January, 2010. There are no facts of record to justify ATM's reliance on a statement from a surgeon who performed surgery in 2003 to assess Matanic's then-present ability to perform his essential job functions in 2009. The record is also clear that ATM's contracted medical clinic failed to conduct an individualized assessment of Matanic's ability to perform the essential functions of his position, and was not even aware of the essential functions Matanic was expected to perform. Indeed, even when Matanic obtained an independent pre-employment examination that resulted in a conclusion that he was cleared for duty, including a comprehensive examination of his back and range of motion, ATM's medical clinic rejected it. This is because ATM and its contracted medical clinic were protecting themselves from the perceived risks and concerns for potential liability associated with Matanic's "pre-existing injury." Employment decisions based on fears, myths, stereotypes and generalizations, like the one at issue here, are precisely what the ADA, as amended, was enacted to prohibit.

## II.   UNDISPUTED MATERIAL FACTS

**AMERICAN TOOL & MOLD, INC.**  ATM custom designs and manufactures molds for injection plastics and plastic parts. (*Giannakopoulos* 20:24-25; 21:1-17). ATM's work is separated into two "sides:" the technical side, which physically creates parts, and the molding side, which works with customers to design the parts and tools. (*Giannakopoulos* 39:4-25; 40:1-25; 41:1-7); (*D.Loulourgas* 33:4-25; 34:1-6,19-25; 35:10-13). Emilia Giannakopoulos is

the company's Chief Executive Officer ("CEO").[2] (*Giannakopoulos* 11:24-25; 12:1-2).
Demetre Loulourgas, Emilia's father, is ATM's President. (*Id.* 18:4-12); (*D.Loulourgas* 17:8-
15). Penelope "Penny" Loulourgas, Emilia's mother, is ATM's Treasurer and Vice-President
and has been the head of the Human Resources Department since 2005. (*Giannakopoulos*
18:4-12); (*P.Loulourgas* 10:20-25; 11:1-25). Michael Eikenberry was ATM's General
Manager and ran ATM's operations in 2009 and 2010. (*D.Loulourgas* 37:1-8; 51:1-22);
(Eikenberry Decl. ¶2). Eikenberry reported to the President and CEO. (*D.Loulourgas* 38:5-
15).

**ATM'S POLICY ON POST-OFFER MEDICAL EXAMINATIONS.** ATM hired Lakeside
Occupational Medical Clinic[3] ("Lakeside") to conduct its pre-employment physical
examinations and drug tests; Lakeside documents its findings and reports them to ATM.
(Pl.Ex. 16, p.1); (*P.Loulourgas* 41:3-25; 42:1-25; 43:1-20; 54:17-25; 55:1-16; 60:1-6, 24-25;
61:1-15; 93:1-25); (*Guzik* 23:21-25; 24:1-21). ATM has contracted with Lakeside for these
functions for *at least* the past 10 years and, according to Lakeside, since 1979.[4] (*Guzik* 23:21-
25; 24:1-5, 14-21); (*D.Loulourgas* 41:19-25; 42:1). ATM's human resources department
coordinates the scheduling of pre-employment medical screenings with Lakeside and its
head, Penelope Loulourgas, is Lakeside's primary contact. (*P.Loulourgas* 55:20-25; 56:1-
14); Pl.Ex.3, p.EEOC-00612, 635-638.

---

[2] Giannakopoulos, ATM's CEO, has never been trained on equal employment opportunity laws and is not
familiar with the ADA. (*Giannakopoulos* 44:18-25; 45:7-25; 46:1-25; 47:1-2). ATM's President and CEO have
no role in the pre-employment screening process and leave those matters to the Human Resources Department.
(*Id.* 43:1-18);(D.Loulourgas 93:7-15).
[3] Lakeside styles itself an "expert in the field of occupational medicine," *see* http://www.lakesideoccmed.com,
and provides the following types of services: physical examinations, medical testing, substance testing and
Worker's Compensation injury management, consulting and staffing services. (*Guzik* 13:21-25; 14:1-6).
[4] Nora Arlene Guzik, Lakeside's Assistant Medical Director and Vice President of Operations, testified as
Lakeside's corporate representative pursuant to Rule 30(b)(6).

ATM required Lakeside to conduct a drug test and a physical, including a back screening, on every prospective employee, regardless of position, as a condition of employment. *See* Pl.Ex.7, p.2; Pl.Ex.1; (*Guzik* 49:19-25; 50:1-12; 54:10-14; 55:1-25; 56:1-14); (Eikenberry Decl. ¶12-13). ATM also required every prospective employee, regardless of the position they applied for, to be able to lift 35 lbs. (*Guzik* 53:2-25; 54:1-25; 56:3-18); (*P.Loulourgas* 46:8-25; 47:1-2). Nora Arlene Guzik, a Nurse Practitioner with a doctoral degree in nursing practice, has been Lakeside's Assistant Medical Director since 2009. (*Guzik* 4:12-18; 9:12-25; 10:1-8). Erin Gwyn, an Advanced Registered Nurse Practitioner ("ARNP"), worked for Lakeside between 1998 and 2010 and performed pre-employment medical examinations for Lakeside's contracted employers.[5] (*Gwyn* 16:22-25; 17:1-17; 86:4-12).

Lakeside's pre-employment examinations for ATM are conducted to determine whether the prospective employee is capable of performing the essential functions of the job for which they were hired and for the purpose of determining whether there is a current or potential future risk to the employee and/or whether the employee can safely perform the job requirements. Pl.Ex.1; (*Guzik* 47:15-25; 48:1-2); (*P.Loulourgas* 164:24-25; 165:1-22); (*Gwyn* 9:11-10:23). Even though Lakeside looks to ATM for guidance on the functional job demands as it relates to this testing, (*Guzik* 53:2-9), Lakeside did not request and ATM did not provide job descriptions as part of the pre-employment examination process. (*Guzik* 51:3-

---

[5] Gwyn graduated from medical school in 2008, but has not completed a residency, or her Step III examination, and is not licensed to practice medicine. (*Gwyn* 26:11-12; 33:11-19).

25; 52:1; 56:19-25; 57:1).[6] Additionally, neither ATM's President nor its Human Resources Manager provide instructions or guidance to Lakeside about how to do their medical clearances or medical examinations and neither has any role in ensuring that Lakeside performs its services in accordance with equal opportunity laws. (*D.Loulourgas* 46:15-23; 48:18-22); (*P.Loulourgas* 41:1-25; 42:1-24; 49:16-25; 50:1-53:1-23; 54:17-25; 55:1-56:1-4). Instead, ATM relies on Lakeside's guidance and professional medical opinions as to whether an applicant is "fit for duty" in order to avoid on-the-job injuries and potential liability for them. Pl.Ex.7; (*P.Loulourgas* 42:3-25; 43:2-20; 164:25; 165:1-11; 167:2-25; 168:19); (*D.Loulourgas* 73:1-25; 74:1-21; 119:7-18).[7]

**ATM CONDITIONALLY HIRES MICHAEL MATANIC.** On October 22, 2009, ATM's General Manager, Michael Eikenberry, recruited and extended an offer of employment to Charging Party, Michael D. Matanic ("Matanic") for the position of Process Engineer. Pl.Ex.1; (Eikenbery Decl. ¶¶2-4). The offer required, and Matanic accepted, the requirement of medical testing to determine his ability to perform the essential functions of the position. *See* Pl.Ex.1, ¶2; (Eikenberry Decl. ¶¶12-13). The Process Engineer position was on the "technical" side of ATM's business and required physical labor including lifting heavy machinery, bending, and climbing on top of large machines. Pl.Ex.2; (*Matanic* 60:1-64:25); (*D.Loulourgas* 35:15-18; 69:3-15). Since approximately 1990, Michael Matanic worked in

---

[6] Penny Loulourgas testified that she was told – at some point in the distant past – that Lakeside representatives visited ATM and took stock of the company's functions. (*P.Loulourgas* 44:10-25; 45:1-2; 47: 8-21; 165: 23-25; 166:1-2). However, in 2009-2010, Lakeside personnel was not aware of them. (*Guzik* 96:24-25; 97:1-4); (*Gwyn* 77:4-6).

[7] Indeed, Lakeside's *Back History* questionnaire, given to all of ATM's prospective employees, asks specifically whether the prospective employee's back injury was a worker's compensation injury, whether Lakeside can contact the previous employer regarding Worker's Compensation claims and whether the prospective employee ever had a medical condition that resulted in impairment ratings or permanent restrictions. *See* Pl.Ex.3, p. EEOC-00617; (*Guzik* 29:24-30:23).

the injection molding industry in various capacities including, but not limited to, machine operator, set-up technician, process technician, process engineer, shift supervisor, production manager and partner. (*Matanic* 51:3-25; 52:1-58:25; 59:1-16).

Eikenberry previously hired and supervised Matanic at Adept Custom Molding Southwest in El Paso, Texas, was aware of his skill set and thought he would be a good fit for the position. (Eikenbery Decl. ¶5, 6). At the time of the offer, Eikenberry was also aware that Matanic had previously had back surgery[8] because the surgery occurred while Matanic worked with him at Adept, and that Matanic had a criminal history, including time in prison. (Eikenbery Decl. ¶¶5-9). Although Matanic did not have a high school diploma, Eikenberry would have hired him in any event because Matanic had the "equivalent" in that he had the right skill set for the job. (*Matanic* 64:16-65:19; 66:16-69:5; 69:25-74:11); (Eikenberry Decl. ¶31); Pl.Ex.2.

**MATANIC IS DEEMED "NOT FIT."** Matanic presented himself to ATM on November 6, 2009, had a tour of the facility, filled out an employment application and related paperwork and was sent to the Lakeside Clinic for ATM's mandatory pre-employment screening. (*Matanic* 90:1-25; 91:1-25; 117:17-24; 121:2-6); Pl.Ex.3. At Lakeside, Matanic completed a Short Health History form and a Back History form, among others, and advised Lakeside that he applied for the position of Process Engineer at ATM, and that in 2003 he suffered an injury to his lumbar spine at L4 for which he had corrective surgery. *See* Pl.Ex.3, p.EEOC-613-614, 616-617. He also indicated, however, that he felt great, (*Matanic* 128:16-

---

[8] On August 21, 2003, Mr. Matanic had surgery on his back to repair a herniated disk. (*Matanic* 126:3-4; 156:10-19); (Pl.Ex.3, p.EEOC-00624-00632). His surgeon was Paul H. Cho, M.D. and Mr. Matanic returned to work three to six weeks after his surgery. (*Matanic*157:6-11); (Eikenberry Decl. ¶7).

19), currently suffered from no medical disability and was not currently being treated for any medical condition, that he did not require accommodations, that he had no limitations on his physical activities and was taking no medications. *See* Pl.Ex.3, p.EEOC-00613. Matanic further advised that he exercised regularly with weights. *See* Pl.Ex.3, p.EEOC-00617.

Lakeside personnel performed a basic physical on Matanic, which included his vital signs, height, weight and visual capacities and indicated that he was "normal" in all respects, including his back. *See* Pl.Ex.4; (*Gwyn* 44:9-18). However, following Lakeside's policy, Erin Gwyn informed Steven Yeager, a recently-hired nurse practitioner performing Matanic's physical examination, that Lakeside could not proceed with the back screen required by ATM. (*Gwyn* p.46:20-22; p.48:15-25; p.49:1-9; p.49:19-51:4). Gwyn and Yeager deemed Matanic "not fit" for duty until a release from Matanic's 2003 back surgeon could be obtained which provided that he had no permanent restrictions. (*Gwyn* 50:3-9; 51:5-9; 51:16-23; 54:9-14); (*Guzik* p.63, lines 9-19); Pl.Ex.3, p. EEOC-00612, 615-616, 618; Pl.Ex.7, p. EEOC-00050; Pl.Ex.12, p.1. Gwyn's conclusion was communicated to ATM. Pl.Ex.7; (*D.Loulourgas* 93:16-94:7); (*P.Loulourgas* 93:11-94:3); (Eikenberry Decl. ¶14). Matanic was not examined by a medical doctor at Lakeside. (*Gwyn* 83:12-14). Lakeside did not have a copy of Matanic's job description, did not request one from ATM, and did not discuss Matanic's job functions with him. (*Guzik* 51:3-25; 52:1); (*Gwyn* 77:4-21; 88:15-89:10; 93:6-20). Matanic provided Lakeside with medical records relating to is 2003 back surgery but Lakeside deemed the information insufficient. Pl.Ex.3, p.EEOC-00612, 624-632; Pl.Ex.12, p.1.

On November 12, 2009, ATM informed Matanic that he would not be eligible for permanent hire until the requested release was received. (*Matanic* 131:5-132:12); (*D.Loulourgas* 71:7-72:19); (Eikenberry Decl. ¶15). Matanic also supplemented his ATM employment application with a statement providing that, "I had back surgery 8-2003 to shave 2 disks that where [sic] causing left leg and back pain. The surgery was successful and I have worked in the same capacity as before the surgery with no ill effects. I had no restrictions after the surgery and have none now." Pl.Ex.5; (*Matanic* 125:3-12); *see also* Pl.Ex.12, p. EEOC-00043. ATM gave Matanic additional time to obtain the release and permitted him to start work on a conditional basis on November 12, 2009. (*P.Loulourgas* 84:11-14; 94:15-25; 95:1-25); (Eikenberry Decl. ¶¶16-17); Pl.Ex.12, p.EEOC-00043; (*Matanic* 161:21-162:2).

### EVIDENCE OF MATANIC'S ABILITY TO PERFORM ESSENTIAL FUNCTIONS IS REJECTED.

Matanic provided Lakeside with a release for his 2003 surgical records from the El Paso Specialty Hospital and made efforts to locate his 2003 work release from his back surgeon, Paul H. Cho, but was unable to obtain a copy of it. (*Matanic* 130:1-131:25); (*Guzik* 77:9-16); (*Gwyn* 63:15-64:21); (Eikenberry Decl. ¶19); Pl.Ex.3, p. EEOC-00624-625, 00632.[9] Instead, on January 12, 2010 while on vacation in Minnesota and with Lakeside's permission, Matanic went to another occupational medicine clinic and was examined by John Pietersen, M.D., who obtained a back history from Matanic and performed tests to evaluate Matanic's body systems and range of motion. *See* Pl.Ex.6; (*Matanic* 140:6-14; 142:10-25; 143:1-14);

---

[9] Matanic also contacted a local orthopedic surgeon, who told him that he required an MRI before he could be seen and that it could cost approximately $2,000. *See* P.Ex.12; (*Matanic* 147:3-17). Matanic's request that ATM pay for it was denied because, although ATM's President made employee loans before, Matanic did not approach ATM's President and "say, Demetre, what can I do to be okay? What can I do to prove that I am okay? Can you help me out to find to go to the doctor and see what I can do there …") (*D.Loulourgas* 140:8-25; 142:1-25; 143:1-18).

(Eikenberry Decl. ¶23); (*Pietersen* 8:8-22; 11:9-25; 12:1-14:15; 15:1-7; 16:1-16; 17:7-25; 18:1-21; 19:3-9; 23:4-5; 24:1-25; 25:1-2). As reflected in his report dated January 12, 2010, Dr. Pietersen concluded that Matanic exhibited "no evidence of residual disease" and had "no work restrictions." Pl.Ex.6, pp. 4-6; (*Pietersen*, 14:2-5; 18:11-17).[10] As of the time of Dr. Pietersen's report, Matanic had been successfully performing all of the functions of the process engineer job at ATM since November 12, 2009. (Eikenberry Decl. ¶18).

Matanic presented the Worker Status Report prepared by Dr. Pietersen to Erin Gwyn at the Lakeside Clinic on January 13, 2010. (*Matanic* 144:16-22); (*Gwyn* 68:12-69:15); Pl.Ex.3, p. 00633-634; (Eikenberry Decl. ¶23). Gwyn determined that the report was "not what is needed for clearance," and that Matanic had failed to provide "appropriate medical documentation from the surgical team that performed the procedure [in] 2003 stating that he has no permanent restriction in order to proceed with the clearance for the position with American Tool & Mold." Pl.Ex.3, p.EEOC-00633-00634; (*Matanic* 145:13-25; 146:1-3). Accordingly, Lakeside deemed Matanic "not fit for duty" and communicated this conclusion to ATM. Pl.Ex.3, p.00633; (Eikenberry Decl. ¶24); (*Gwyn* 69:6-15; 71:4-7).

**MATANIC'S TERMINATION.** Because Matanic was not cleared for duty by Lakeside, ATM terminated his employment. (Eikenberry Decl. ¶¶24-25); Pl.Ex.7, p.EEOC-00051; (*P.Lourlourgas* 109:12-16); (*D.Loulourgas* 73:20-74:1; 100:16-24). Matanic was terminated, not for any performance-related reason, but because he did not provide a medical release from his back surgeon indicating that he had no restrictions resulting from his 2003 back

---

[10] ATM's likely attack on Dr. Pietersen's report will be that he did not ask Matanic to do a static lift of 100lbs. Of course, Erin Gwyn made no effort to determine what Pietersen did and, therefore, it played no role in her decision to declare Matanic not fit as of January 5, 2010. (*Gwyn* 72:9-11; 75:7-12; 76:14-19; 92:2-9). Moreover, unlike Gywn, Pietersen would not have required a review of Matanic's medical records before requiring such a lift test. (*Pietersen* 30:2-12).

surgery. (Eikenberry Decl. ¶¶26-28, 30); (*D.Loulourgas* 55:4-15; 70:1-25; 71:1-25; 72:1-19; 73:1-25; 74:1-6; 77:5-18; 99:5-25; 100:1-25; 101: 1-20; 104:2-9; 104:19-22; 105:5-9; 107:12-19). ATM's President was not aware of anything that made him think Matanic was unqualified for his position, (*D.Loulourgas* 108:11-5), and was not aware of anything negative about him. (*D.Loulourgas* 126:5-7). Indeed, Matanic had done "nothing wrong" and if he had supplied the information that Lakeside required, "he would have a job and he would have probably [ ] been a plant manager himself…" (*P.Loulourgas* 142:1-11). Matanic had no physical difficulty performing his duties at ATM and successfully performed all of his position's essential functions between November 12, 2009 and January 20, 2010, when he was terminated. (Eikenberry Decl. ¶¶18, 27, 30); Pl.Ex.5, p. EEOC-00051. (*D.Loulourgas* 68: 21-23). Eikenberry disagreed with the decision to terminate Matanic on this basis and advised the Loulourgases that he worked with Matanic when the back surgery occurred, he saw paperwork releasing him to work without restrictions at that time and he observed Matanic do the job without problems after surgery at Adept and at ATM. (Eikenberry Decl. ¶27).

**EEOC INVESTIGATES MATANIC'S CHARGE OF DISCRIMINATION AND FINDS CAUSE.** On August 5, 2010, Matanic filed a charge of discrimination with the EEOC. *See* Pl.Ex.8. On June 8, 2012, the EEOC found reasonable cause to believe that ATM violated the ADA and invited Matanic and ATM to enter into the voluntary conciliation process. *See* Pl.Ex.9; Pl.Ex.10.  The parties agreed to conciliate and EEOC sent a proposed conciliation agreement to ATM. ATM, the EEOC and Charging Party participated in negotiations until September 18, 2012 when ATM introduced new counsel who withdrew all prior offers and agreements

and offered a new proposal that was unacceptable to the Charging Party.[11] As a result, on September 21, 2012, EEOC determined that conciliation efforts were unsuccessful. *See* Pl.Ex.11.

**EEOC FILES SUIT.**  EEOC filed suit on December 10, 2012, alleging that ATM violated the ADA when it terminated Matanic because it regarded him as disabled.  *See* D.E. #1. ATM filed its Answer and Affirmative Defenses, D.E. #42, which raised two affirmative defenses relating to the merits: (1) the EEOC's alleged failure to engage in good faith conciliation; and (2) that Matanic was unqualified for the Process Engineer position because he had a criminal history and did not have a high school diploma. *See id.* ¶¶61, 63.

### III. WELL-SETTLED PRINCIPLES OF LAW REQUIRE SUMMARY JUDGMENT

The moving party bears the initial burden of stating the basis for its motion and identifying those portions of the record demonstrating the absence of genuine issues of material fact. Fed. R.Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986). When the moving party points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324–25; *see also Harty v. City of Sanford*, No. 6:11-CV-1041-ORL-31, 2012 WL 3243282 (M.D. Fla. Aug. 8, 2012). In determining whether a genuine issue of material fact exists, the court must consider all the evidence in the light most favorable to the nonmoving party.

---

[11]Prior to September 18, 2013, ATM was represented by Alfred Torrence, Esq. of Thorton, Torrence and Barneff, P.A.

*Celotex,* 477 U.S. at 323. Thereafter, summary judgment is mandated against the non-moving party who fails to establish a genuine issue of fact for trial. *Id.* at 322, 324–25.

**A.** ***Summary Judgment Should Be Granted on ATM's Failure to Conciliate Defense.***

Whenever the EEOC determines that there is reasonable cause to believe that a Charge of Discrimination is true, the EEOC shall "endeavor to eliminate any such alleged unlawful employment practice by informal methods of conference, conciliation, and persuasion." 42 U.S.C. § 2000e-5(b).[12] To do so, EEOC must: (1) outline to the employer the reasonable cause for its belief that there has been a violation of the law; (2) offer an opportunity for voluntary compliance; and (3) respond in a reasonable and flexible manner to the reasonable attitudes of the employer. *EEOC v. Asplundh Tree Expert Co.*, 340 F.3d 1256, 1259 (11th Cir. 2003). The "fundamental question is the reasonableness and responsiveness of the EEOC's conduct under all the circumstances." *Id.* The undisputed facts demonstrate that EEOC satisfies each of the three criteria set forth above.

**1. EEOC Outlined the Reasonable Cause for its Belief that the ADA was Violated.**

EEOC's Letter of Determination identified the legal theory of liability against ATM as well as the factual basis supporting it. *See* Pl.Ex.9, p.1. As such, EEOC satisfies the first *Asplundh* requirement. *See, e.g., EEOC v. Nordstrom*, No. 07-80894-CIV, 2008 WL 5100206, *2 (S.D. Fla. Nov. 25, 2008) ("The EEOC issued its letter of determination on July 20, 2007 setting out the basis for its reasonable cause findings."); *EEOC v. Riverview*

---

[12]Title I of the ADA invokes the same 'powers, remedies and procedures' as those set forth in Title VII. *See* 42 U.S.C. § 12117(a); *see also EEOC v. Alia Corp.*, 842 F. Supp. 2d 1243, 1251 (E.D. Cal. 2012).

*Animal Clinic, P.C.*, 761 F. Supp. 2d 1296, 1301 (N.D. Ala. 2010) ("…EEOC provided

Defendant with the basis for its findings through its discrimination determination…").

### 2.  EEOC Offered ATM an Opportunity for Voluntary Compliance.

EEOC invited ATM and Matanic to conciliate on June 8, 2012; Matanic accepted the

invitation on June 12, 2012 and ATM accepted on July 3, 2012. *See* Pl.Ex.10. Thereafter,

EEOC proposed a draft conciliation agreement and, thereafter, EEOC, Matanic and ATM

negotiated the terms of the proposed conciliation agreement for several months until

September 18, 2013 when ATM introduced new counsel, withdrew all previous offers and

agreements and proposed new terms unacceptable to the Charging Party.[13] Accordingly, the

EEOC declared the conciliation a failure on September 21, 2012. Pl.Ex.11. Based on these

facts, ATM cannot dispute that EEOC offered an opportunity for voluntary compliance. *See*

*EEOC v. Riverview Animal Clinic, P.C.*, 761 F. Supp. 2d 1296, 1301 (N.D. Ala. 2010)

(EEOC conciliated in good faith where EEOC identified its rationale in the determination,

---

[13]  "Nothing said or done during and as a part of such informal endeavors may be made public by the Commission, its officers or employees, or used as evidence in a subsequent proceeding without the written consent of the persons concerned." 42 U.S.C. § 2000e-5(b). Accordingly, the documents reflecting actual conciliation negotiations are privileged pursuant to 42 U.S.C. §2000e-5(b) and have been cataloged on EEOC's privilege log. *See* Pl.Ex.22. While the Eleventh Circuit reviews the EEOC's conciliation efforts to ensure good faith based on reasonableness and flexibility, the court's focus must be on the *process* of conciliation, not on the substance of the back and forth negotiations. *See, e.g., Asplundh Tree Expert Co.*, 340 F.3d at 1259 ("In evaluating whether the EEOC has adequately fulfilled this statutory requirement, 'the fundamental question is the reasonableness and responsiveness of the EEOC's conduct under all the circumstances.'"). Thus, courts generally do not second guess the substance of EEOC's proposed conciliation agreements, but instead focus on whether the overall process was reasonable. *Dinkins*, 133 F.Supp.2d at 1244 ("EEOC is a veritable repository of institutional knowledge and experience. There is no basis to speculate that EEOC's request of $1 million and injunctive relief was out of line with what it reasonably believed was necessary to 'eliminate the unlawful employment practice and provide appropriate affirmative relief' to a class of aggrieved CP employees."); *Riverview Animal Clinic, P.C.,* 761 F.Supp.2d 1301 (noting that the "parties then engaged in several months of ongoing and relatively amicable conciliation efforts involving multiple offers and counteroffers" without going into the substance of same).

invited Defendant to voluntarily settle, extended the deadline to conciliate, exchanged offers and counteroffers, even though charging party ultimately rejected Defendant's offers).

### 3. EEOC Responded in a Reasonable and Flexible Manner to ATM.

Finally, it cannot be disputed that EEOC responded in a reasonable and flexible manner to ATM throughout the conciliation process. EEOC provided ATM with a draft conciliation agreement proposal and negotiated in good faith with ATM until September 18, 2013 when ATM withdrew from substantive negotiation and proposed a new take-it-or-leave-it proposal which was unacceptable to the Charging Party. Thus, EEOC did not determine that conciliation efforts failed until after providing ATM with the opportunity, and sufficient time, to engage in good faith conciliation. *See EEOC v. Phillips Colleges, Inc.*, 984 F.Supp. 1464, 1470 (M.D. Fla. 1997); *EEOC v. Mastec N. Am., Inc.*, No. 8:05CV1226 SCB TGW, 2006 WL 3949167 (M.D. Fla. Oct. 24, 2006). As such, because the undisputed facts demonstrate that EEOC satisfies all three *Asplundh* criteria, summary judgment is due to be granted as to ¶61 of ATM's Answer and Affirmative Defenses.

### B. Summary Judgment Should be Granted in EEOC's Favor on its ADA Claim.

The ADA prohibits discrimination against qualified individuals with disabilities in regard to "job application procedures" and "hiring." 42 U.S.C. §12112(a).[14] To prevail on a claim for disability discrimination, the EEOC must demonstrate that Michael Matanic: (1) is

---

[14] The ADA was amended by the Americans with Disabilities Act Amendments Act of 2008 ("ADAAA"). The ADAAA applies to conduct occurring after January 1, 2009, the effective date of the amendment. *See Fikes v. Wal-Mart, Inc.*, 322 Fed. App'x. 882, 883 n.1 (11th Cir. 2009). In enacting the ADAAA, Congress intended to "reinstat[e] a broad scope of protection to be available under the ADA," and which had "eliminate[ed] protection for many individuals whom Congress intended to protect." ADA Amendments Act of 2008, Pub. L. No. 110–325, 122 Stat 3553 (2008) (codified as amended in scattered sections of 42 U.S.C. §_). The Court's analysis of this case is therefore guided by the ADAAA, as well as the EEOC's Regulations to Implement the Equal Employment Provisions of the ADA, as amended, 29 C.F.R. § 1630 (2011). As recognized in *Harty v. City of Sanford*, No. 6:11-CV-1041-ORL-31, 2012 WL 3243282, *5 (M.D. Fla. Aug. 8, 2012), there are very few published court opinions applying the ADAAA.

disabled; (2) is a qualified individual; and (3) was subjected to unlawful discrimination because of a disability. *Jones v. STOA Int'l/Florida, Inc.,* 422 F. App'x 851, 852 (11th Cir. 2011), *citing Holly v. Clairson Indus., L.L.C.,* 492 F.3d 1247, 1255 (11th Cir. 2007).[15]

### 1. Matanic is Disabled Within the Meaning of the ADA.

An individual is "disabled" under the ADA when they are regarded as having an impairment. *See* 42 U.S.C. §12102(1)(C). "Under the more expansive standards of the ADAAA, an individual is regarded as disabled if he establishes that '[]he has been subjected to an action prohibited under this Act because of an actual or perceived physical or mental impairment ....'" *Harty v. City of Sanford*, No. 6:11-CV-1041-ORL-31, 2012 WL 3243282 (M.D. Fla. Aug. 8, 2012); *see also,* 42 U.S.C. § 12102(3)(A). In contrast to the pre-amendment ADA, an individual is "regarded as" disabled under the ADAAA "whether or not the impairment limits or is perceived to limit a major life activity." *Azzam v. Baptist Healthcare Affiliates, Inc.*, 855 F. Supp. 2d 653, 661 (W.D. Ky. 2012). "[E]vidence that a covered entity took a prohibited action because of an impairment will establish coverage ..." *City of Sanford*, 2012 WL 3243282, at *5 citing 29 C.F.R. Pt. 1630.2(l), App.; 29 C.F.R. § 1630.2(l).

Here, Matanic disclosed his 2003 back surgery to Lakeside Clinic and to ATM in the pre-employment examination process. Because Matanic had back surgery, Lakeside deemed him not fit for work as of November 6, 2009 and deferred further examination of his back until he produced a statement from his 2003 back surgeon indicating that he had no permanent

---

[15]"Under the controlling law in this Circuit, the burden-shifting analysis of Title VII employment discrimination claims is applicable to ADA claims." *Jones,* 422 F. App'x at 852.

restrictions. When Matanic could not produce such a release/statement, and Lakeside had rejected the results of Matanic's independent pre-employment examination on January 13, 2013, ATM withdrew its conditional offer of employment based – not on his physical condition or any individualized assessment of his then-present ability to perform the essential functions of the process engineer position – but because of his inability to provide "medical documentation from the surgical team that performed the procedure and [sic] 2003 state that he has no permanent restriction in order to proceed with clearance for the position with American Tool and Mold." Pl.Ex.3, p. EEOC-00634; Pl.Ex.7, p. EEOC-00051. At the time of his post-offer medical examination and termination, Matanic had no medical conditions for which he required medical treatment, had no restrictions or limitations on his ability to work as a process engineer, his back was determined to be "normal," and he was successfully performing the essential functions of his position. Notwithstanding these facts, according to ATM, "[f]ailure to obtain this documentation and continue employment of the applicant could put ATM at risk of potential liability and possibly cause harm or irreparable harm to applicant." *Id.*  Accordingly, the undisputed facts demonstrate that ATM regarded Matanic as disabled within the meaning of the ADA, as amended. *See Lundstedt v. City of Miami*, No. 93-1402-CIV-MARCUS, 1995 WL 852443, *7-9 (S.D. Fla. Oct. 11, 1995)(applicant with a back injury who previously applied for permanent and total disability and retirement from service as a City fire fighter, was regarded as disabled and denied reinstatement where he testified that he was able to return to work, that his condition improved, that he engages in physical exercise and currently works in construction, a field of work he considered more strenuous than being a fire fighter);  *Azzam v. Baptist Healthcare Affiliates, Inc.*, 855 F.

Supp. 2d 653, 661 (W.D. Ky. 2012)(employee regarded as disabled where employer knew employee was not been cleared by her doctor to resume a normal schedule following stroke).

**2.  Michael Matanic is a Qualified Individual with the Meaning of the ADA.**

A "qualified individual with a disability" is an "individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). "Qualified" means that the individual satisfies "the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires and, with or without reasonable accommodation, can perform the essential functions of such position." 29 C.F.R. § 1630.2(m); *see also, EEOC v. Texas Bus Lines,* 923 F.Supp. 965, 970-971 (S.D.Tex. 1996).

**a.  Matanic Possessed the Skill, Experience, Education and Other Job-Related Requirements of the Position.**

Matanic possessed the skill and experience to successfully perform all of the duties of his position. Matanic has worked in the injection molding industry in various capacities since 1990, was specifically recruited by ATM's Plant Manager, Michael Eikenberry, because he had the right skill set for the job and – by all accounts – was not terminated due to his inability to perform the job.

EEOC anticipates that ATM will argue that Matanic was not qualified for the position because, at the time he was conditionally hired: (1) he did not have a high school diploma; and (2) he had a criminal history. *See* D.E. #42, ¶63. [16] Although Matanic did not have a high

---

[16] ATM also asserts that Matanic falsified his employment application by lying about his education and criminal history on his employment application.  Rather than a defense to liability, this after-acquired evidence defense

school diploma at the time of his hire at ATM, a high school diploma was not required for employment at ATM as a process engineer/technician. (*P.Loulourgas* 77:16-24; 158:24-25; 159:1-25; 160:1-7); (*D.Loulourgas* 123:14-25). Indeed, ATM hired individuals with a high school diploma or *equivalent* – "equivalent" meaning that the person had to have the knowledge required to finish high school. (*D.Loulourgas* 123:6-13); Pl.Ex.2. The hiring supervisor, Michael Eikenberry, attests that he would have hired Matanic, even without a high school diploma, based on his knowledge of Matanic's skill set. (Eikenberry Decl. ¶¶6, 31). Similarly, the fact that Matanic had a criminal history would not have disqualified him for his position at ATM, *see* Pl.Ex.4 ("A convictional record will not necessarily exclude you from consideration …"), and Michael Eikenberry was aware of Matanic's history at the time he recruited and offered Matanic employment, and noted that Matanic was honest and forthcoming about it. (Eikenberry Decl. ¶9); (*Matanic* 82:12-19). Finally, Matanic met ATM's requirement that all of its employees be able to lift at least 35 lbs. Matanic–his 2003 back surgery notwithstanding–was capable of performing all of the physical tasks associated with his job and there was no function he could not perform, including lifting up to 100 lbs. (*Guzik* 53:2-3); (Eikenberry Decl., ¶¶8, 18, 27, 28, 30); Pl.Ex.6. Accordingly, it cannot be disputed that Matanic possessed the requisite education, skill, experience and qualifications required for the process engineer position.

### b. Matanic Could and Did Perform the Essential Functions of the Position Without Need for a Reasonable Accommodation.

Between November 12, 2009 and January 20, 2010, Matanic actually–and successfully–

---

would pertain, if at all, to Matanic's damages and, therefore, need not be considered here. *See McKennon v. Nashville Banner Publ. Co.*, 513 U.S. 352, 362-63 (1995).

performed all the duties of process engineer at ATM. Michael Eikenberry, Matanic's supervisor at ATM confirmed that Matanic was performing the job and there was no part of the job that he could not do. (Eikenberry Decl. ¶¶8, 18, 27, 28, 30). As a result, and taken together with Section (a) above, Matanic is a qualified individual with a disability within the meaning of the ADA.

### 3.   Michael Matanic was Subjected to Unlawful Discrimination.

Under the ADA, discrimination includes:[17] (3) utilizing standards, criteria, or methods of administration . . . (A) that have the effect of discrimination on the basis of disability. 42 U.S.C. §12112(3). While employers are permitted to "require a medical examination after an offer of employment has been made to a job applicant and prior to the commencement of the employment duties of such applicant, and may condition an offer of employment on the results of such examination," such permission is conditioned upon two requirements: "(A) all entering employees are subjected to such an examination regardless of disability; . . . and (B) "the results of such examination are used only in accordance with this subchapter." *Id.* §12112(d)(3).   While an "[e]mployment entrance examination" of this kind does not have to be "job-related" or "consistent with business necessity" at the outset, *see* §12112(d)(3)(C), an employer's reasons for withdrawing a conditional job offer must be "job-related and consistent with business necessity." 29 C.F.R. § 1630.14(b)(3). An employer may only

---

[17] Section 12112(b)(2) of the ADA also includes within its definition of "discrimination," "participating in a contractual or other arrangement or relationship that has the effect of subjecting a covered entity's qualified applicant or employee with a disability to the discrimination prohibited by this subchapter …" *See also* 29 C.F.R. § 1630.6. Accordingly, under this statutory provision and its implementing regulations, ATM is responsible for its reliance on the decisions of Lakeside Occupational Medical Center with respect to its applicants for employment. Because ATM is a covered entity participating in a contractual or other arrangement or relationship with Lakeside for services relating to post-offer, pre-employment medical screenings, ATM cannot avoid liability under the ADA for decisions it attributes to Lakeside with respect to Matanic. *See Rodriguez v. ConAgra Grocery Prod. Co.,* 436 F.3d 468, 484 (5th Cir. 2006); *EEOC v. Texas Bus Lines,* 923 F.Supp. 965, 982 (S.D.Tex. 1996).

withdraw the conditional job offer if "performance of the essential job functions cannot be accomplished with reasonable accommodation." *Id.* The Equal Employment Opportunity Commission further explains:

> The results of a medical inquiry or examination may not be used to disqualify persons who are currently able to perform the essential functions of a job, either with or without an accommodation, because of **fear** or **speculation** that a disability may indicate a greater risk of future injury, or absenteeism, or may cause future workers' compensation or insurance costs.

Equal Employment Opportunity Commission, *Technical Assistance Manual on the Employment Provisions (Title I) of the Americans with Disabilities Act* § 6.4 (1992) (hereinafter "EEOC Technical Assistance Manual"); *see also, Garrison v. Baker Hughes Oilfield Operations, Inc.*, 287 F.3d 955, 960-961 (10th Cir. 2002) (employer misused employee's post-offer medical exam results where employee advised of multiple injuries in a short time and was told his offer was revoked because of a risk of "possible future injuries"); *Holiday v. City of Chattanooga,* 206 F.3d 637, 640–648 (6th Cir. 2000) (employer may not rely on the results of a lawful medical examination to deny employment to an individual unless the examination reveals that an impairment suffered by the individual precludes him or her from performing the "essential functions" of the desired position). If a physical or mental examination reveals that a prospective employee suffers from an impairment that could *potentially* preclude the performance of "essential" work-related tasks, an employer may reject that prospective employee only on the basis of an "individualized determination" that the impairment will *actually* preclude the performance of those tasks. *Id.* at 644, citing *Taylor v. Pathmark Stores, Inc.,* 177 F.3d 180, 193 (3d Cir.1999). An employer who rejects an applicant pursuant to a belief that an impairment, real or perceived, will render him or her

incapable of performing "essential" job duties runs the risk of being wrong and incurring liability. *See, e.g., Taylor,* 177 F.3d at 193.

> a. **ATM/Lakeside Did Not Perform Any Individualized Assessment of Matanic's Ability to Perform the Essential Functions of the Process Engineer Position.**

ATM required Lakeside to conduct a back screen for every employee, regardless of position or job function. However, Lakeside's policy prohibited a back screen when the patient-employee noted they had back surgery in their medical history. Accordingly, Lakeside never performed a back screen on Matanic and never assessed whether he could lift 35lbs.[18] Gwyn did not know what the essential functions of Matanic's position were, did not have a job description and does not recall asking for them. *See Rodriguez v. ConAgra Grocery Prod. Co.,* 436 F.3d 468, 484 (5th Cir. 2006) (doctor's lack of information about the job belied the notion that there was an individualized assessment mandated by the ADA). To the extent an individualized assessment was performed by Dr. Pietersen, Lakeside rejected it. *See* Pl.Ex.3, p.EEOC-00633. Matanic was never seen by a licensed medical doctor at Lakeside, and Lakeside never requested Pietersen's records or even contacted him to determine what testing was performed at the time. The fact that an old release and/or statement of restrictions relating to Matanic's 2003 back surgery would have sufficed to clear Matanic for employment as a process engineer underscores that no individualized assessment of Matanic's ability to perform the essential functions of the position was required by ATM or sought by Lakeside. *See Lentos v. Hawkins Const. Co.,* No. 4:07CV3045, 2007 WL

---

[18] Indeed, Gwyn testified that the question wasn't whether Matanic could lift 35 lbs, but whether he *should*. (*Gwyn* 97:21-24).

3376760 (D. Neb. Nov. 7, 2007)(rejecting employer's reliance on a 2003 impairment rating because it "does not establish that the plaintiff was incapable of performing the essential functions of a concrete finisher in April 2006" when the offer of employment was withdrawn).

In the absence of an individualized assessment, ATM's termination decision did not "reflect a well-informed judgment grounded in a careful and open-minded weighing of the risks and alternatives," and was, instead, based on "simply conclusory statements" or "reflexive reactions." *ConAgra Grocery Prod. Co.,* 436 F.3d at 484 (employer liable for employment decision based on concern for risks posed by employee as well as blind reliance on doctor where employee's abilities were not evaluated and the medical assessment lacked knowledge of the employee's position and its essential functions); *EEOC v. Texas Bus Lines,* 923 F.Supp. 965, 982 (S.D.Tex. 1996) ("If an employer's relationship with a physician who conducts a medical examination results in the discriminatory rejection of applicants protected by the ADA, the employer is liable for a violation of the statute despite the involvement of a third party, the doctor, with whom the employer had a professional arrangement."); *Kelley v. Bechtel Power Corp.*, 633 F. Supp. 927, 934 (S.D.Fla. 1986).

Moreover, "if certain criteria are used to screen out an employee or employees with disabilities as a result of such a [medical] examination or inquiry, **the exclusionary criteria must be job-related and consistent with business necessity**, and performance of the essential job functions cannot be accomplished with reasonable accommodation as required in this part." 29 C.F.R. § 1630.14(B)(3) (emphasis added). "[J]ob-relatedness is used in analyzing the questions or subject matter contained in a test or criteria used by an employer"

22

as a basis for an employment decision, while "[b]usiness necessity, in context, is larger in scope and analyzes whether there is a business reason that makes necessary the use by an employer of a test or criteria" for such a decision." *Owusu–Ansah v. The Coca–Cola Co.*, 715 F.3d 1306, 1311 (11th Cir. 2013); *Chancey v. Fairfield S. Co., Inc.*, No. 2:11-CV-3609-VEH, 2013 WL 2635682 (N.D. Ala. June 12, 2013).

As set forth in detail above, the requirement that Matanic produce a statement from his 2003 back surgeon attesting to the existence of permanent restrictions did not relate to Matanic's then-present ability to perform the essential functions of the job and the "business" justification – preventing worker's compensation claims and/or fears of potential future injuries – is not a permissible reason under the ADA to exclude prospective employees from employment. ATM cannot show that the release/statement requirement was job-related and consistent with business necessity.; therefore, ATM must show that Mr. Matanic posed a direct threat because of his prior medical condition. *See Chancey*, 2013 WL 2635682 at *14.

### c. ATM Cannot Demonstrate that Matanic was a "Direct Threat."

The ADA recognizes that an impairment that poses a "direct threat" to an individual's own health and safety, or that of others, can be a legitimate business necessity that justifies excluding an individual from employment. *See* 29 C.F.R. § 1630.15(b)(2). However, the determination that such a direct threat exists must be based on "an individualized assessment of the individual's present ability to safely perform the essential functions of the job" and "a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence." *Id.* at § 1630.2(r). An employee constitutes a direct threat if he or she poses "a significant risk to the health or safety of others that cannot be eliminated

by reasonable accommodation." *Id.* § 12111(3); *see also* 29 C.F.R. § 1630.2(r). "Significant risk" means a "high probability of substantial harm; a speculative or remote risk is insufficient." 29 C.F.R. §1630.2(r).

Matanic was not a direct threat. There is no record evidence that ATM/Lakeside conducted or accepted any individualized assessment of Matanic's then-present ability to safely perform the essential functions of the process engineer job. The generalized belief that Matanic's six year old back injury/surgery posed a potential safety threat is insufficient. 29 C.F.R. § 1630.2(r); *see e.g., Crutcher v. Mobile Hous. Bd.*, No. 04-0499-WS-M, 2005 WL 2675207 (S.D. Ala. Oct. 20, 2005) (employer's subjective feelings that it was unsafe for plaintiff to drive did not satisfy the quantum of proof needed to prevail on direct threat defense).

### a. ATM/Lakeside Impermissibly Relied on Generalizations and Stereotypes in Determining that Matanic was Not Fit for Duty.

In *School Board of Nassau County v. Arline,* the Supreme Court explained that "Congress acknowledged that society's accumulated myths and fears about disability and diseases are as handicapping as are the physical limitations that flow from actual impairment." 480 U.S. 273, 284 (1987). As a result, individuals rejected from a job because of the "myths, fears and stereotypes" associated with disabilities are covered under the "regarded as" prong of the definition of disability, whether or not the individual's actual physical or mental condition would be considered a disability under the first or second part of the definition. *Id.* at 283.

Here, the undisputed record evidence demonstrates that ATM terminated Matanic based on generalizations, "fears and stereotypes" about persons who have had back injuries. (*See D.Loulourgas* 73:14-19). Indeed, ATM's President explained that the clearance

addresses ATM's concerns about future injuries and related that ATM had an employee with a pre-existing back problem who claimed he fell into a machine on the third shift when no one was around. ATM suspected that was not the case and that his injuries were pre-existing. He noted that this could be avoided by knowing about the employee's back problem and giving the employee things to do to prevent injury. (*Id.* 74:7-23). Further, Penny Loulourgas' admission her September 24, 2010 letter to EEOC-that Matanic's "[f]ailure to obtain the documentation and continue employment of the applicant could put ATM at risk of potential liability and possibly cause harm or irreparable harm to applicant"-provides direct evidence of the unlawful stereotypes and misconceptions motivating ATM's actions. *See* Pl.Ex.7.[19] Screening out employees on the basis of perceived disability, out of fear of future risk or liability, is not permitted under the ADA. *See Garrison v. Baker Hughes Oilfield Operations, Inc.*, 287 F.3d 955, 960 (10th Cir. 2002).

CONCLUSION. For the foregoing reasons, Plaintiff U.S. Equal Employment Opportunity Commission respectfully requests that the Court grant summary judgment against Defendant American Tool & Mold, Inc. ("ATM") on the merits of EEOC's claim under Americans with Disabilities Act, 42 U.S.C. §12112, *et seq.,* as amended, and with respect to ATM's affirmative defenses based on conciliation and qualification.

---

[19] ATM's Human Resource Manager testified that the signed statement she submitted to the EEOC was prepared by ATM's attorney's  office and not her personally. (*P.Loulourgas* 125:1-150:25). However, ATM's written statements to the EEOC, even when communicated through counsel, constitute admissible evidence as admissions by a party-opponent pursuant to Rule 801(d)(1) of the Federal Rules of Evidence. *See* Fed. R.Evid. 801(d)(1). Moreover, "[federal courts consider position statements to the EEOC when deciding motions for summary judgment, particularly when those statements constitute evidence of an employer's motivation in taking an adverse employment action against an employee." *McInnis v. Alamo Comm. College Dist.*, 207 F.3d 276, 282 (5th Cir. 2000); *Olisky v. Spencer Gifts, Inc*., 964 F.2d 1471, 1477 (5th  Cir. 1992); *Galambos v. Fairbanks Scales*, 144 F.Supp.2d 1112, 1119 n.4 (E.D.Mo. 2000); *Smolensky v. General Electric Co.*, No. 99-1849, 2000 WL 341031 (E.D.La. Mar. 30, 2000); *EEOC v. Rockwell Int'l Corp.*, 60 F.Supp.2d 791, 793 (N.D.Ill. 1999).

Dated this 26th day of September, 2013.

                                              Respectfully submitted,

                                              ROBERT WEISBERG
                                              Regional Attorney
                                              Florida Bar # 285676

                                              s/Kimberly A. McCoy Cruz
                                              KIMBERLY A. McCOY CRUZ
                                              TRIAL COUNSEL
                                              Florida Bar No: 153729
                                              Supervisory Trial Attorney
                                              Equal Employment Opportunity
                                              Commission
                                              Miami District Office
                                              Miami Tower
                                              100 S.E. 2nd Avenue, Suite 1500
                                              Miami, Florida 33131
                                              Tel: 305-808-1790
                                              Fax: 305-808-1835
                                              kimberly.mccoy-cruz@eeoc.gov

## CERTIFICATE OF SERVICE

I hereby certify that on September 26, 2013, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to:

George E. Tragos, Esq. (george@greeklaw.com), and Peter A. Sartes, Esq. (peter@greeklaw.com), Tragos & Sartes, P.L., 601 Cleveland Street, Clearwater, Florida 33755; and

James M. Thompson, Esq. (jmthompsonlegal@gmail.com), and K.C. Hopkinson, Esq. (khthompsonlegal@gmail.com), Thompson Legal Center, LLC, 5010 W. Carmen St., Suite 2030, Tampa, FL 33609-2051.

                                              s/Kimberly A. McCoy Cruz
                                              KIMBERLY A. McCOY CRUZ