**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,

      Plaintiff,

v.                                     Case No: 8:12-cv-2772-T-35EAJ

AMERICAN TOOL & MOLD, INC.,

      Defendant.

_____

## ORDER

**THIS CAUSE** comes before the Court for consideration of the Motion for Summary Judgment (Dkt. 67) filed by Plaintiff, Equal Employment Opportunity Commission ("EEOC"), the Motion for Summary Judgment (Dkt. 68) filed by Plaintiff Intervenor Michael Matanic ("Matanic"), the Response in opposition thereto filed by Defendant, American Tool & Mold, Inc. ("ATM") (Dkt. 74), and the Reply in Support (Dkt. 83) filed by the EEOC. Upon consideration of all relevant filings, case law, and being otherwise fully advised, the Court **GRANTS** Plaintiffs' motions for summary judgment.

## I.    BACKGROUND

The EEOC has moved for summary judgment on its claim that ATM violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12102 *et seq.* in its handling of Michael Matanic's application for employment and subsequent pre-employment physical examination, and on ATM's affirmative defense of failure to conciliate. (Dkt. 67 at 12-25) In sum, the EEOC argues that ATM violated the ADA by regarding Matanic as disabled

after he informed ATM of a back surgery he underwent several years prior to applying to ATM.

The Court permitted the EEOC to reveal certain information made confidential by 42 U.S.C. § 2000e-5(b) related to the failure to conciliate defense.   (Dkt. 81)   Thereafter, ATM gave "notice of its withdrawal [of] its Failure to Conciliate Affirmative Defense found in paragraph 61 of the Answer."   (Dkt. 90)   Accordingly, the Court need not address the failure to conciliate defense, as Defendant has abandoned it.

Matanic has likewise moved for summary judgment on his claims for violations of the ADA and the Florida Civil Rights Act.   However, "[b]ecause federal case law is applicable to claims arising under the Florida Civil Rights Act ('FCRA'), [the] claims under the ADA and the FCRA will be analyzed together."   Markwart v. United Parcel Serv., Inc., 2:13-CV-186-FTM-38, 2013 WL 3864347, at *2 n.2 (M.D. Fla. July 24, 2013); Myers v. Winn-Dixie Stores, Inc., 8:10-CV-1987-T-17TGW, 2012 WL 529552, at *12 (M.D. Fla. Feb. 10, 2012) ("Because the Florida Civil Rights Act ('FCRA') is nearly identical to the Americans with Disabilities Act of 1990, 42 U.S.C. Secs. 12101 et seq. ('ADA'), federal law interpreting the ADA is applicable to claims arising under the FCRA.") (citing Holly v. Clairson Industries, L.L.C., 492 F.3d 1247, 1255 (11th Cir. 2007)).

## II.    FACTS

American Tool & Mold, Inc. ("ATM") custom designs and manufactures molds for injection plastics and plastic parts.   (Dkt. 75 at 1)   ATM's work is separated into two "sides:" the technical side, which physically creates parts, and the molding side, which works with customers to design the parts and tools.   (Dkt. 75 at 1-2)

Emilia Giannakopoulos is the company's Chief Executive Officer. (Dkt. 75 at 2) ATM's President and CEO have no role in the pre-employment screening process and leave those matters to the Human Resources Department. (Dkt. 75 at 2) Demetre Loulourgas, Emilia's father, is ATM's President. (Dkt. 75 at 2) Penelope "Penny" Loulourgas, Emilia's mother, is ATM's Treasurer and Vice-President and has been the head of the Human Resources Department since 2005. (Dkt. 75 at 2) Michael Eikenberry was ATM's General Manager and ran ATM's operations in 2009 and 2010. Eikenberry reported to the President and CEO. (Dkt. 75 at 2)

On October 22, 2009, Mr. Eikenberry, recruited and extended an offer of employment to Michael D. Matanic ("Matanic") for the position of Process Engineer. (Dkt. 75 at 5) The offer required medical testing to determine Matanic's ability to perform the essential functions of the position. (Dkt. 75 at 5)

During the relevant time frame, up to and including the present, the job description for Process Technician[1] at ATM includes the minimum requirement of a high school diploma or equivalent. (Dkt. 75 at 10) Matanic did not have a high school diploma. (Dkt. 75 at 5)

Matanic presented himself to ATM on November 6, 2009, had a tour of the facility, completed an employment application and related paperwork, and was sent to Lakeside Occupational Medical Clinic 3 ("Lakeside") for ATM's mandatory pre-employment screening. (Dkt. 75 at 6)

---

[1] Although not directly addressed by the parties, the Court assumes that the minimum requirements listed for a "Process Technician" (Dkt. 67-2) apply with equal force to a "Process Engineer," as Matanic described the Process Engineer position as essentially being a step above the position of Process Technician. (Dkt. 67-14 at 64) ("A process engineer is looked at as someone who has the skill set of a process set-up technician, a process technician and material handler and is able to understand more about the materials, the molds, the methodologies employed in molding than one would expect a process technician to understand.")

ATM retained the services of Lakeside to conduct its pre-employment physical examinations and drug tests.   Lakeside documents its findings and reports them to ATM. (Dkt. 75 at 2)   ATM has contracted with Lakeside for these functions for at least the past 10 years and, according to Lakeside, since 1979.   (Dkt. 75 at 2)

ATM's human resources department coordinates the scheduling of pre-employment medical screenings with Lakeside, and its head, Penelope Loulourgas, is Lakeside's primary contact.   (Dkt. 75 at 3)   ATM required Lakeside to conduct a drug test and a physical, including a back screening, on every prospective employee, regardless of position, as a condition of employment.   (Dkt. 75 at 3)   ATM also required every prospective employee, regardless of the position they applied for, to be able to lift 35 pounds.   (Dkt. 75 at 3)

Nora Arlene Guzik, a Nurse Practitioner with a doctoral degree in nursing practice, has been Lakeside's Assistant Medical Director since 2009.   (Dkt. 75 at 3)   Erin Gwyn, an Advanced Registered Nurse Practitioner ("ARNP"), worked for Lakeside between 1998 and 2010 and performed pre-employment medical examinations for Lakeside's contracted employers.   (Dkt. 75 at 3)   Gwyn graduated from medical school in 2008 with an M.D., completed examinations for Step I and Step II, but has not completed a residency, or her Step III examination, and is not licensed to practice medicine.   (Dkt. 75 at 4)

Lakeside's pre-employment examinations for ATM are conducted to determine whether the prospective employee is capable of performing the essential functions of the job for which they were hired and for the purpose of determining whether there is a current or potential future risk to the employee and/or whether the employee can safely perform

4

the job requirements.   (Dkt. 75 at 4)   Even though Lakeside looks to ATM for guidance on the functional job demands as it relates to this testing, Lakeside did not request and ATM did not provide job descriptions as part of the pre-employment examination process. (Dkt. 75 at 4)   Additionally, neither ATM's President nor its Human Resources Manager provide instructions or guidance to Lakeside about how to conduct their medical clearances or medical examinations.   (Dkt. 75 at 4)   Instead, ATM relies on Lakeside's guidance and professional medical opinions as to whether an applicant is "fit for duty" in order to avoid on-the-job injuries and potential liability.   (Dkt. 75 at 4)

Penny Loulourgas testified that she was told – at some point in the distant past – that Lakeside representatives visited ATM and took stock of the company's functions. (Dkt. 75 at 5)   However, in 2009-2010, Lakeside personnel was not aware of those functions.   (Dkt. 75 at 5)

Lakeside's "Back History" questionnaire, given to all of ATM's prospective employees, asks specifically whether the prospective employee's back injury was a worker's compensation injury, whether Lakeside can contact the previous employer regarding Worker's Compensation claims, and whether the prospective employee ever had a medical condition that resulted in impairment ratings or permanent restrictions. (Dkt. 75 at 5)

At Lakeside, Matanic completed a Short Health History form and the Back History form, among others; advised Lakeside that he applied for the position of Process Engineer at ATM; and that in 2003 he suffered an injury to his lumbar spine at L4 for which he had corrective surgery.   (Dkt. 75 at 6)   Specifically, on August 21, 2003, Mr.

Matanic had surgery on his back to repair a herniated disk; he underwent an L4-L5 lumbar laminectomy, medial facetectomy, foraminotomy, and a discectomy.   (Dkt. 75 at 9)

Following Lakeside's policy, Erin Gwyn informed Steven Yeager, the nurse practitioner performing Matanic's physical examination, that Lakeside could not proceed with the back screen required by ATM.   (Dkt. 75 at 6)   Lakeside never performed a back screen on Matanic and never assessed whether he could lift 35 pounds.   (Dkt. 75 at 5) Gwyn testified that the question was not whether Matanic could lift 35 pounds, but whether he should.   (Dkt. 75 at 5)

Lakeside completed a physical examination form indicating that Matanic was "recommend[ed] not fit for employment/work at this time because: More medical information needed, specifically old records of back surgery[,] requested medical statement of if restriction is warranted s/p Left L4-L5 lumbar laminectomy statement from surgeon in El Paso, TX date of surgery 8/21/03."   (Dkt. 75 at 9)   Gwyn's conclusion was communicated to ATM.   (Dkt. 75 at 6)

Matanic provided Lakeside with a release for his 2003 surgical records from El Paso Specialty Hospital.   (Dkt. 75 at 7)    On November 6, 2009, Lakeside requested the records.   (Dkt. 75 at 9)   ATM gave Matanic additional time to obtain the release/restrictions and permitted him to start work on a conditional basis on November 12, 2009.   (Dkt. 75 at 7)

El Paso Specialty Hospital provided Lakeside with medical records relating to Matanic's 2003 back surgery but Lakeside deemed the information insufficient.   (Dkt. 75 at 7)   On November 12, 2009, ATM informed Matanic that he would not be eligible for

permanent hire until the requested release or statement of restrictions from his 2003 surgery ("release/restrictions") was received.   (Dkt. 75 at 7)

Matanic supplemented his ATM employment application with a statement providing that, "I had back surgery 8-2003 to shave 2 disks that where [sic] causing left leg and back pain. The surgery was successful and I have worked in the same capacity as before the surgery with no ill effects. I had no restrictions after the surgery and have none now."  (Dkt. 75 at 7)

Matanic was not examined by a medical doctor at Lakeside.   (Dkt. 75 at 6) Lakeside did not have a copy of Matanic's job description, did not request one from ATM, and did not discuss Matanic's job functions with him.   (Dkt. 75 at 6-7)

On January 12, 2010, Matanic was examined by Dr. John Pietersen in Chaska, Minnesota.   (Dkt. 75 at 9)   Dr. Pietersen would not have required a review of Matanic's medical records before asking Matanic to engage in a lift test of 100 pounds.   (Dkt. 75 at 7)   Matanic presented a "Worker Status Report" prepared by Dr. Pietersen to Erin Gwyn at the Lakeside Clinic on January 13, 2010.   (Dkt. 75 at 8)

Gwyn determined that the report was "not what is needed for clearance," and that Matanic had failed to provide "appropriate medical documentation from the surgical team that performed the procedure [in] 2003 stating that he has no permanent restriction in order to proceed with the clearance for the position with American Tool & Mold."   (Dkt. 75 at 8)   Accordingly, Lakeside deemed Matanic "not fit for duty" and communicated this conclusion to ATM.   (Dkt. 75 at 8)   Matanic was thereafter terminated.   (Dkt. 75 at 8)

On August 12, 2010, Matanic filed a charge of discrimination with the EEOC. (Dkt. 75 at 8)   On June 8, 2012, the EEOC found reasonable cause to believe that ATM

violated the ADA and invited Matanic and ATM to enter into the voluntary conciliation process.   (Dkt. 75 at 8)

## III.   STANDARD OF REVIEW

Summary judgment is appropriate when the movant can show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law.   Fennell v. Gilstrap, 559 F.3d 1212, 1216 (11th Cir. 2009) (citing Welding Servs., Inc. v. Forman, 509 F.3d 1351, 1356 (11th Cir. 2007)).   Which facts are material depends on the substantive law applicable to the case.   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).   The moving party bears the burden of showing that no genuine issue of material fact exists.   Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).

Evidence is reviewed in the light most favorable to the non-moving party.   Fennell, 559 F.3d at 1216 (citing Welding Servs., Inc., 509 F.3d at 1356).   A moving party discharges its burden on a motion for summary judgment by showing or pointing out to the Court that there is an absence of evidence to support the non-moving party's case. Denney v. City of Albany, 247 F.3d 1172, 1181 (11th Cir. 2001) (citation omitted).

When a moving party has discharged its burden, the non-moving party must then designate specific facts (by its own affidavits, depositions, answers to interrogatories, or admissions on file) that demonstrate there is a genuine issue for trial.   Porter v. Ray, 461 F.3d 1315, 1320-1321 (11th Cir. 2006) (citation omitted).   The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts.   Evers v. Gen. Motors Corp., 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value.").   If a party fails to properly support an assertion of fact or fails to properly address another

party's assertion of fact . . . the court may grant summary judgment if the motion and supporting materials . . . show that the movant is entitled to it.   Fed. R. Civ. P. 56(e).

## IV.   DISCUSSION

The ADA prohibits discrimination "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."   42 U.S.C. § 12112(a).   To establish a prima facie case under the ADA, a plaintiff must demonstrate that (1) he is disabled under the ADA, (2) he is a qualified individual, with or without accommodations, and (3) he was unlawfully discriminated against because of his disability.   Rossbach v. City of Miami, 371 F.3d 1354, 1356-57 (11th Cir. 2000).

The ADA defines "disability" to include (a) a physical or mental impairment that substantially limits one or more of the major life activities of such individual, (b) a record of such impairment, or (c) being regarded as having such impairment.   Id. at 1354 (citing 42 U.S.C § 12102(2)) (quotations omitted).

The term "substantially limiting" comprises either (1) the inability to perform a major life activity that the average person in the general population can perform, or (2) a significant restriction as to the condition, manner, or duration under which an individual can perform a particular major life activity as compared to that of the average person in the general population.   Loperena v. Scott, 2009 WL 1066253, at *12 (M.D. Fla. April 21, 2009) (citations omitted) aff'd, 356 Fed. Appx. 240 (11th Cir. 2009).   The term "major life activities" is defined as "functions such as caring for oneself, performing manual tasks,

walking, seeing, hearing, speaking, breathing, learning, and working." Loperena, 2009 WL 1066253, at *12.

Under the ADA, an employer may require a medical examination after an offer of employment is made and condition the offer on the results of the examination, as long as three requirements are met: (A) all entering employees are subjected to such an examination regardless of disability; (B) information obtained regarding the medical condition or history of the applicant is collected and maintained on separate forms and in separate medical files and is treated as a confidential medical record; and (C) *the results of such examination are used in accordance with the ADA*. See 42 U.S.C. § 12112(d)(3) (emphasis added); Flores v. American Airlines, Inc., 184 F. Supp. 2d 1287, 1294 (S.D. Fla. 2002).

While noting in its motion that "[u]nder the controlling law in this Circuit, the burden-shifting analysis of Title VII employment discrimination claims is applicable to ADA claims," (Dkt. 67 at 15 n.15), the EEOC also contends that certain statements of defendant amount to direct evidence of discrimination, (Id. at 25). "[I]f direct evidence of discrimination exists, the familiar framework for establishing a *prima facie* case based on circumstantial evidence and the alternating burdens of production and proof established by *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), do not apply." Loperena v. Scott, 2009 WL 1066253, at *9 (citing Price Waterhouse v. Hopkins, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989); Lee v. Russell County Bd. of Educ., 684 F.2d 769, 773–74 (11th Cir.1982)).

### a. Regarded as Disabled

Plaintiffs' lawsuit in this case is based on the contention that Matanic was "regarded as" being disabled when his conditional offer of employment was revoked. The ADA Amendments Act of 2008 ("ADAAA"), Pub. L. No. 110–325, 122 Stat. 3555 (2008), made it significantly easier for plaintiffs to bring "regarded as" disabled claims.[2]

"An individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity."   42 U.S.C. § 12102(3); see also 29 C.F.R. § 1630.2 (same); Harty v. City of Sanford, 2012 WL 3243282, at *5 (M.D. Fla. 2012); Mayorga v. Alorica, Inc., No. 12–21578–CIV, 2012 WL 3043021, at *8 (S.D. Fla. July 25, 2012).   The relevant inquiry in

---

2  Under the prior standard,

> [a] plaintiff may be "regarded as" disabled in two ways: "(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." *Sutton,* 527 U.S. at 489, 119 S.Ct. 2139; *see also D'Angelo,* 422 F.3d at 1228. With respect to the major life activity of working, Plaintiff must demonstrate that she is "regarded as precluded from more than a particular job." *Murphy v. United Parcel Serv., Inc.,* 527 U.S. 516, 523, 119 S.Ct. 2133, 144 L.Ed.2d 484 (1999). Specifically, Plaintiff must demonstrate that she was regarded as unable to perform "either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." *Carruthers v. BSA Advertising,* 357 F.3d 1213, 1216 (11th Cir.2004) (adopting 29 C.F.R. § 1630.2(j)(3)(i)).

Garavito v. City of Tampa, 640 F. Supp. 2d 1374, 1380-81 (M.D. Fla. 2009) (footnotes omitted).

such cases is not the plaintiff's actual condition, but how the Defendant "perceived [his] condition, including the reactions and perceptions of the persons interacting with or working with him." Mayorga, 2012 WL 3043021, at *8 (citation omitted).

The appendix to the rules explains:

> To illustrate how straightforward application of the "regarded as" prong is, if an employer refused to hire an applicant because of skin graft scars, the employer has regarded the applicant as an individual with a disability. Similarly, if an employer terminates an employee because he has cancer, the employer has regarded the employee as an individual with a disability.

29 C.F.R. § 1630, App.[3]   Moreover, the "regarded as" analysis is separate from whether the employer can eventually establish a defense to the action:

> Thus, for example, an employer who terminates an employee with angina from a manufacturing job that requires the employee to work around machinery, believing that the employee will pose a safety risk to himself or others if he were suddenly to lose consciousness, has regarded the individual as disabled. Whether the employer has a defense (e.g., that the employee posed a direct threat to himself or coworkers) is a separate inquiry.

Id.

The EEOC argues that ATM regarded Matanic as disabled after he revealed his 2003 back surgery.   Thereafter, Lakeside deemed him not fit for work and deferred further examination of his back until he produced a statement from his 2003 back surgeon, Dr. Cho, indicating whether he had permanent restrictions.   When Matanic failed to produce the release/restrictions statement, and Lakeside rejected the results of Dr.

---

[3] "Although the EEOC's administrative interpretations are not binding, they 'do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.'" McCoy v. Geico Gen. Ins. Co., 510 F. Supp. 2d 739, 749 (M.D. Fla. 2007) (quoting Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 65 (1986)).

Pietersen's examination, ATM withdrew its conditional offer of employment based, according to the EEOC, not on Matanic's "physical condition or any individualized assessment of his then-present ability to perform the essential functions of the process engineer position – but because of his inability to provide 'medical documentation from the surgical team that performed the procedure [in] 2003.'"   (Dkt. 67 at 15-16)

ATM contends it "did not discriminate against Matanic because they 'perceived him as disabled;'" rather, "[t]hey did not have the necessary information to safely ascertain his level of physical ability one way or another," and thus, "Matanic was not hired because he did not comply with Lakeside to satisfy ATM's company policy that all persons must be medically cleared as 'fit for duty.'"   (Dkt. 74 at 10)   The undisputed facts show otherwise.

As explained above, when Matanic arrived at Lakeside he filled out a "Short Health History" form and a "Back History" form.   (Dkt. 67-3 at 3-4, 7)   The "Exam Worksheet" provided to Lakeside personnel includes instructions from ATM regarding the type of pre-employment physical ATM required.   (Dkt. 67-3 at 2; Dkt. 67-21 at 40-43)   Here, ATM required a drug test; a "Short Form," which is a basic physical exam on Lakeside's physical exam form; and a back screening.   (Dkt. 67-3 at 2; Dkt. 67-21 at 42-43)

Steven Yeager performed the examination of Matanic.   (Dkt. 67-21 at 46, 48-50) The Exam Worksheet notes that the back screening was not performed.   (Dkt. 67-3 at 2) Rather, Gwyn informed Yeager that "Lakeside couldn't do the back screening because [Matanic] had a previous back surgery.   Our policy was to acquire documentation that he was okay as far as restrictions.   If there's any restrictions, we needed to get it in writing,

and once we [ac]quired that information, he could come back and do the [35]-pound lift required by the company and then we could clear him." (Dkt. 67-21 at 49)

Gwyn explained that on the day of the exam Matanic "wasn't deemed not fit at that time. His physical was placed on hold. He was deemed not fit on 1/5/10 [when] we never got the [surgery related] information." (Dkt. 67-21 at 49-50) Gwyn agreed that Lakeside had a "blanket policy that whenever someone had surgery[,] medical documentation of restrictions was required," and testified that, "[t]hat is a big component of the pre-employment screening." (Dkt. 67-21 at 50-51)

Matanic testified that Lakeside also indicated that a clearance from an independent physician would likewise suffice in place of the release/restrictions from the 2003 surgery. (Dkt. 67-14 at 140) Based on that indication, Matanic obtained the Worker Status Report from Dr. Pietersen and provided it to Lakeside. (Id. at 140-45) As to its rejection, Gwyn testified that the report was insufficient because it was a "not a functional capacity exam," "it was too vague," failed to "include enough medical history to even make a decision on," and failed to include a date from when Matanic no longer had limitations. (Dkt. 67-20 at 75-76) Guzik, testifying as Lakeside's corporate representative, testified similarly: "What I'm trying to say is I don't know what led to their decision-making. I don't know what questions were asked. I don't see a health history that the person, Mr. Matanic, provided to them. I don't see results of a physical examination that was conducted on him. And, again, it does not appear that this is a medical provider who was engaged with him in the evaluation and treatment of his back condition. And that's what we were looking for." (Dkt. 67-19 at 22-23) Dr. Pietersen testified that in preparing the report he (1) did not have "reports from any previous medical providers," (2) he "was going off of what the

patient had told me," (3) he did not perform any lift tests.   (Dkt. 67-20 at 15-18)   After

the Pietersen report was rejected, Matanic also testified that he was informed that an

examination by an orthopedic surgeon would also be acceptable; however, the cost for

such an exam was approximately $2,000, and neither ATM nor his insurance would cover

that cost, and he could not afford it.   (Dkt. 67-14 at 147-51)

The letter from Lakeside to ATM deeming Matanic "not fit" was premised on

Matanic's failure to provide the 2003 surgeon's release/restrictions:

> Medical decision making: it was reillerated [*sic*] to the patient
> that appropriate medical documentation is required from the
> surgical team that performed the procedure [in] 2003 stating
> that he has no permanent restriction in order to proceed with
> the clearance for the position with American Tool and Mold.
> Please note, the patient has been verbally aggressive during
> interaction with various Lakeside Team members.
>
> Plan:
> Deemed Not Fit because more medical information is
> warranted prior to granting of clearance.

(Dkt. 67-3 at 24)[4]

ATM disputes the import of these facts.   Thus, while the EEOC draws from them

the conclusion that ATM regarded Matanic as disabled, ATM asserts that it "did not

discriminate against Matanic because they 'perceived him as disabled'. They did not have

the necessary information to safely ascertain his level of physical ability one way or

another.   Matanic was not hired because he did not comply with Lakeside to satisfy

ATM's company policy that all persons must be medically cleared as 'fit for duty'."   (Dkt.

74 at 10) (citations omitted)

---

4 In response to an email containing this letter, Eikenberry wrote: "Well that is certainly unacceptable. I understand mikes frustration however I cannot accept an unprofessional attitude. . . .   I guess I am left with no re-course other than to confirm with Lakeside tomorrow and take appropriate action in this case." (Dkt. 74-2 at 1)

The Court finds, as a matter of law, that ATM regarded Matanic as disabled.   This case is similar to Rodriguez v. ConAgra Grocery Products Co., 436 F.3d 468 (5th Cir. 2006).   There, operating under the more demanding pre-ADAAA standard, the Fifth Circuit reversed the District Court and found as a matter of law that ConAgra regarded Rodriguez as disabled.   Just as in this case, Rodriguez was subject to a pre-employment examination by ConAgra's third-party clinic, Occupational Health Solutions ("OHS"). "OHS's Dr. Jerry Morris performed Rodriguez's physical exam," and, as in this case, "ConAgra had never provided Dr. Morris with any data or restrictions applicable to the position, and Dr. Morris admitted that when he examined Rodriguez he knew nothing of Rodriguez's job offer or the qualifications necessary for the Production Utility position." Id. at 472.   Dr. Morris performed an urinalysis that revealed elevated glucose levels, and based on that result, combined with Rodriguez's inability to recall the name of his treating physician or the name of the medication he was taking to control his diabetes, "Dr. Morris concluded that Rodriguez's diabetes was 'uncontrolled,'" and thus Dr. Morris concluded that "Rodriguez was '[n]ot medically qualified' for the position."   Id.

ConAgra's Human Relations manager, Elza Zamora, testified that "based on Dr. Morris's assessment, she viewed Rodriguez's diabetes as uncontrolled. . . . This, according to Zamora, could lead to dizziness and blacking out, thereby preventing Rodriguez from performing the essential duties of his job."   Id. at 477.   Likewise, "Dr. Morris testified that the results of Rodriguez's urinalysis made him unfit to perform any manual labor job."   Id.   The Court found that "[t]his summary judgment evidence shows beyond cavil, as a matter of law, that ConAgra regarded Rodriguez's diabetes as substantially limiting his ability to engage in the major life activity of working."   Id.

Here, operating under the less exacting standard that now applies for "regarded as" claims, it is undisputed that ATM withdrew its offer of employment because of Matanic's inability to produce the surgeon's records.   It is also undisputed that the only reason ATM (through Lakeside) sought those records was because Matanic disclosed he had undergone back surgery in 2003.   Lakeside's "blanket" policy required applicants who revealed such a surgery to produce a release or restrictions from the treating physician prior to the 35 pound lift going forward.  (Dkt. 67-21 at 50-51)  Thus, once Defendant was made aware of the surgery, it regarded Matanic as disabled, that is, unfit to perform the job until and unless he could prove otherwise.   Unlike the Defendant in the Rodriguez case, ATM did not even undertake to conduct an examination to verify any residual problems from the prior medical intervention; rather it simply ruled Matanic "not fit."   That this was not simply a failure to dot "i's and cross t's based termination" is disclosed by ATM's admitted rationale, which dovetails almost precisely, the commentary on the "regarded as" standard.   In this regard, ATM candidly stated:   "Failure to obtain this documentation and continue employment of the applicant could put ATM at risk of potential liability and possibly cause harm or irreparable harm to applicant."   (Dkt. 67-7 at 2)   Likewise, even in its response to the EEOC's motion, ATM states: "the decisions made by Lakeside and ATM were not made out of any fear, other than the fear of injuring Matanic."  (Dkt. 74 at 3-4)   Compare that explanation with the "regarded as" example provided in 29 C.F.R. § 1630, App., as set forth above: "Thus, for example, an employer who terminates an employee with angina from a manufacturing job that requires the employee to work around machinery, believing that the employee will pose a safety risk

to himself or others if he were suddenly to lose consciousness, has regarded the individual as disabled."    Accordingly, summary judgment is proper on this point.

### b. Qualified Individual

A "qualified individual" is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."   42 U.S.C. § 12111(8).   In making this determination, "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job."   Id.   "'Essential functions' are 'the fundamental job duties of the employment position,' but do 'not include the marginal functions of the position.'" Samson v. Fed. Exp. Corp., 12-14145, 2014 WL 1226847, at *3 (11th Cir. March 26, 2014) (quoting 29 C.F.R. § 1630.2(n)(1)).   "The term 'qualified,' with respect to an individual with a disability, means that the individual satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires and, with or without reasonable accommodation, can perform the essential functions of such position."   29 C.F.R. § 1630.2(m).

Of relevance here, the "Minimum Requirements / Qualifications" listed for the Process Technician position include, a "High school diploma or equivalent," "[f]ollow company policies, and safety rules," "[b]asic knowledge of all aspects of injection molding machine," and "[t]hree to five years of plastic injection molding processing experience." (Dkt. 67-2)

The EEOC contends that Matanic was qualified for the position of process technician, that he possessed the requisite skill, experience, education, and other job related requirements necessary for the position, and that, from November 12, 2009 (when he was conditionally hired) through January 20, 2010 (when his offer was rescinded), Matanic actually and successfully performed all the duties of a process engineer at ATM.

ATM contests two points as to Matanic's qualifications: (1) he did not have a high school diploma or equivalent, and (2) he did not perform the essential requirements of the position between November 12, 2009 and January 20, 2010 as the EEOC asserts.   (Dkt. 74 at 16-17)

It is undisputed that Matanic has neither a high school diploma nor a general equivalency diploma ("GED").   (Dkt. 67-14 at 30-32; Dkt. 75 at ¶ 29)   However, as to what "or equivalent" in the job description requirements means, Demetre Loulourgas, ATM's President, testified: "Equivalent means to be able to meet the knowledge you have to have for the high school that you get through the high school, finish high school."   (Dkt. 67-17 at 123)

ATM takes issue with Demetre Loulourgas's testimony on this issue, arguing that "English is his third language . . . and [he] does not have a native command of English as is evidenced by his unfamiliarity with English words during his deposition."   (Dkt. 74 at 16 n. 9)   However, the English word Mr. Loulourgas had trouble re-calling was "quarry," and it related to a job he held in Athens, Greece in 1964.   (Dkt. 67-17 at 30)   In any event, Mr. Loulourgas submitted an errata sheet, and it made no changes to the above testimony.   (Dkt. 83-2).

Moreover, Mr. Eikenberry—ATM's General Manager at the time and the person who recruited and extended the offer of employment to Matanic, (Dkt. 75 at 2, 5)—averred that while he was not aware at the time he recruited Matanic that Matanic did not have a high school diploma, had he known, "it would not have influenced my decision to offer him the Process Engineer position at ATM because I had previously worked with him and believed he was a good fit for the job and had the right skill set."  (Dkt. 67-15 at ¶ 31)

Thus, despite the meaning typically associated with a job description requiring a "high school diploma or equivalent" as necessitating, at minimum, a GED; here, the only record evidence before the Court is that at ATM, during the time in question, "or equivalent" meant the knowledge necessary to obtain a high school diploma, did not strictly mean a high school diploma or GED, and had Eikenberry known Matanic did not have a high school diploma or GED, he still would have hired him.   Accordingly, Plaintiffs have demonstrated that Matanic possessed the minimum education requirements necessary for the position.

ATM also contends that Matanic misrepresented his educational achievements and criminal background in his application for the position.  (Dkt. 74 at 16)  However, Eikenberry attested that he was aware of Matanic's criminal history at the time he offered Matanic the position and that knowledge did not influence his decision to recruit or offer the position to Matanic.  (Dkt. 67-15 at ¶ 9)  Furthermore, ATM did not become aware of Matanic's educational status until long after it rescinded his offer of employment, and thus this after-acquired evidence only becomes relevant, if at all, in determining potential damages.   See McKennon v. Nashville Banner Pub. Co., 513 U.S. 352, 356 (1995).

The EEOC also asserts that Matanic actually did perform the duties of his position between November 2009 and January 2010.   (Dkt. 67 at 18-19)   Eikenberry attested that "Matanic successfully performed all of the functions of the process engineer job at ATM between November 12, 2009 and January 20, 2010, when he was terminated, including all of the position's essential functions."   (Dkt. 67-15 at ¶ 18)   Likewise, Eikenberry testified that:

- He had worked with Matanic previously at Adept Custom Molders, and that "[a]t Adept Custom Molders, I observed Mr. Matanic's physical ability to do the job of a process technician/engineer after his back surgery.   Mr. Matanic's job at Adept in El Paso was more physically demanding than the process engineer position at ATM."

- "I observed no physical limitations on [Matanic's] ability to perform his job following his surgery in 2003 or while he was working for ATM."

- "I was aware that Mr. Matanic had held similar jobs in the tool and mold industry between 2003 when he had back surgery and the time he was recruited for ATM."

- "Matanic had no physical difficulty doing the work at ATM."

(Dkt. 67-15 at ¶¶ 8, 27, 28, 30)

In response, ATM submits the affidavits of Lee Tran and Mark Tardiff.   (Dkt 74-3; Dkt. 74-4)   Mr. Tardiff explains that between November 2009 and January 2010 he "was plant manager, and [he] worked in the injection molding side of ATM where Mr. Matanic was employed."   (Dkt. 74-4 at 1)   Tardiff explains the requirements of the job and attests that "[d]uring the time period that Mr. Matanic was at ATM, I did not witness him perform the essential job functions of the position of process technician or process engineer." (Id.)   Tardiff also explains that "individuals similarly situated to Mr. Matanic would be trained prior to being allowed to work or substantially perform the requirements of the

position, which can take two to three weeks," but that at the time in question, "Mr. Matanic had no responsibilities and had not yet completed training." (Id. at 1-2)

Mr. Tran attests, inconsistently, that he is "a process technician who started work at American Tool and Mold (ATM) in *July, 2013*," but that he "was working at ATM on first shift when Michael Matanic started in *November 2009*." (Dkt. 74-3) (emphasis added) Despite this timeline discrepancy, Mr. Tran also states that:

- "I only witnessed Mr. Matanic working on two actual projects, because most of the time Mr. Matanic was in an office that was assigned to him, on the phone, not working at all, or talking to Mr. Eikenberry. Mr. Matanic did perform some tasks on the GE project where he looked up information, but he did not do any hands-on work or physical work."

- "During the entire time that Mr. Matanic was at ATM, I never saw him put his hands on a mold, pull a tool, set up a mold, climb into a machine, tighten bolts, hook up water hoses or do any of the mold setup necessary for the position."

- "Mr. Matanic never worked on any new tools because he was not yet properly trained."

(Dkt. 74-3 at 1-2)

The EEOC argues these affidavits are insufficient to create a genuine issue of fact on this point for two reasons: (1) the relevant standard is whether Matanic "can" or "could" perform the duties of the position, not whether he actually "did" do so, and thus the affidavits are irrelevant, and (2) the affidavits lack necessary foundational elements to establish the affiants' ability to assess Matanic, and thus should not be considered. (Dkt. 83 at 8-9)[5]

---

5 As to the second point, the EEOC contends that the Tardiff affidavit fails to demonstrate that he (a) worked the same shift as Matanic; (b) would have been in a position to observe Matanic and, if so, how often; and (c) had the job knowledge or skill to identify and assess whether Matanic performed the essential functions of his job. (Dkt. 83 at 8 n.6) Furthermore, that Tardiff never personally "observed" Matanic performing the essential functions of the job, the EEOC argues, does not mean it did not happen. As to Tran, in addition to the timeline issue noted above, the EEOC contends that his affidavit fails to establish "how often his and Matanic's actual work schedules overlapped," "how often he and Matanic worked in an

The Court agrees that the affidavits are insufficient to create a genuine issue of fact here because the relevant issue is whether Matanic "can" perform the essential functions of the position, not whether he actually did.   See 42 U.S.C. § 12111(8) (defining a "qualified individual" as "an individual who, with or without reasonable accommodation, *can* perform the essential functions of the employment position that such individual holds or desires.") (emphasis added).   Indeed, if plaintiffs were required to prove they had actually performed the essential functions of the job, rather than that they had the ability to do so, refusal to hire claims would be nearly impossible to establish.   Yet, the regulations expressly allow for them.   See 29 C.F.R. § 1630.2(l) (defining "regarded as having such an impairment" and noting that prohibited activities include "refusal to hire").

Even if the affidavits are offered to refute the observations of the EEOC's witnesses concerning Matanic's performance to attempt to create a factual dispute about whether that evidence proves he "could" perform the job, they are inadequate to overcome the other evidence on this point.   Eikenberry, Matanic's supervisor, testified that he could perform the functions of the job.   (Dkt. 67-15 at ¶¶ 8, 18, 27, 28, 30) See also (Dkt. 67-14 at 51-59, 65-74, 210, 216) (Matanic's testimony establishing his time in the industry, relevant skills possessed, and ability to perform essential functions of position)   Moreover, ATM has stipulated that "Matanic was terminated, but not for any performance-related reason," and that "ATM's President was not aware of anything that made him think Matanic was unqualified for his position, and was not aware of anything

---

area where Tran could actually observe Matanic," and it provides "no record evidence that Tran had the job knowledge or skill to identify and assess whether Matanic successfully performed the essential functions of his job."   (Dkt. 83 at 8 n.6)   Because of the Court's determination on the EEOC's first challenge to the affidavits, the Court need not, and does not, reach this issue.

negative about him."  (Dkt. 75 at ¶¶ 46, 47) (citations omitted)  Accordingly, the Court

finds as a matter of law that Matanic was qualified for the position.

### c.  Unlawful Discrimination Because of Disability

Under the ADA, the term "'discriminate against a qualified individual on the basis

of disability' includes . . . utilizing standards, criteria, or methods of administration--(A)

that have the effect of discrimination on the basis of disability." 42 U.S.C.

§ 12112(b)(3)(A).[6]   However, as explained above, the ADA does permit pre-employment

medical exams, under certain conditions:

> A covered entity may require a medical examination after an offer of employment has been made to a job applicant and prior to the commencement of the employment duties of such applicant, and may condition an offer of employment on the results of such examination, if--
>
> (A) all entering employees are subjected to such an examination regardless of disability;
>
> (B) information obtained regarding the medical condition or history of the applicant is collected and maintained on separate forms and in separate medical files and is treated as a confidential medical record, . . . . and
>
> (C) the results of such examination are used only in accordance with this subchapter.

Id. § 12112(d)(3); see also 29 C.F.R. § 1630.14(b) ("A covered entity may require a

medical examination (and/or inquiry) after making an offer of employment to a job

applicant and before the applicant begins his or her employment duties, and may

---

6 Discrimination under the ADA also includes, "participating in a contractual or other arrangement or relationship that has the effect of subjecting a covered entity's qualified applicant or employee with a disability to the discrimination prohibited by this subchapter."  42 U.S.C.§ 12112(b)(2).  On this basis, the EEOC contends that ATM is responsible for its reliance on the decisions of Lakeside regarding applicants for employment, and thus ATM cannot "avoid liability under the ADA for decisions it attributes to Lakeside with respect to Matanic."  (Dkt. 67 at 19 n. 17)  ATM does not appear to contest this point.  See also Rodriguez, 436 F.3d at 484 ("ConAgra cannot escape its obligation to evaluate Rodriguez's actual abilities, notwithstanding his diabetes, by blindly relying on the assessment of Dr. Morris.").

condition an offer of employment on the results of such examination (and/or inquiry), if all entering employees in the same job category are subjected to such an examination (and/or inquiry) regardless of disability.").

Importantly, while "[m]edical examinations conducted in accordance with this section do not have to be job-related and consistent with business necessity," if "certain criteria are used to screen out an employee or employees with disabilities as a result of such an examination or inquiry, the exclusionary criteria must be *job-related* and consistent with *business necessity*, and performance of the essential job functions cannot be accomplished with reasonable accommodation as required in this part." 29 C.F.R. § 1630.14(b)(3) (emphasis added). "'[J]ob-relatedness is used in analyzing the questions or subject matter contained in a test or criteria used by an employer' as a basis for an employment decision, while '[b]usiness necessity, in context, is larger in scope and analyzes whether there is a business reason that makes necessary the use by an employer of a test or criteria' for such a decision." Owusu-Ansah v. Coca-Cola Co., 715 F.3d 1306, 1311 (11th Cir. 2013) cert. denied, 134 S. Ct. 655 (U.S. 2013) (quoting Allmond v. Akal Sec., Inc., 558 F.3d 1312, 1317 (11th Cir. 2009).

Here, there is no dispute that all incoming ATM employees were subject to pre-employment examination. (Dkt. 75 at ¶ 13) Moreover, the parties agree that the results of the pre-employment screening may only be used to withdraw an offer of employment where an individualized determination reveals that the impairment will preclude the putative employee from performing the essential functions of the position. (Dkt. 74 at 17-18; Dkt. 67 at 19-20) See, e.g., Holiday v. City of Chattanooga, 206 F.3d 637, 643-44 (6th Cir. 2000) ("The ADA mandates an individualized inquiry in determining whether

an employee's disability or other condition disqualifies him from a particular position. In order to properly evaluate a job applicant on the basis of his personal characteristics, the employer must conduct an individualized inquiry into the individual's actual medical condition, and the impact, if any, the condition might have on that individual's ability to perform the job in question."); Garavito v. City of Tampa, 640 F. Supp. 2d 1374, 1382 (M.D. Fla. 2009) (finding that Plaintiff was not regarded as disabled because "[a]lthough Plaintiff now avers that Dr. Bohnker did not make an 'individual assessment' . . . it is undisputed that he did make the requisite 'individualized inquiry' into her condition."); Garrison v. Baker Hughes Oilfield Operations, Inc., 287 F.3d 955, 960 (10th Cir. 2002) ("'The results of a medical inquiry or examination may not be used to disqualify persons who are currently able to perform the essential functions of a job, either with or without an accommodation, because of fear or speculation that a disability may indicate a greater risk of future injury, or absenteeism, or may cause future workers' compensation or insurance costs.'") (citations omitted).

The EEOC argues that Lakeside never performed an individualized assessment of Matanic, that Gwyn did not even know what the essential functions of the position were, that to the extent Dr. Pietersen did perform an individualized assessment it was rejected by Lakeside, and that "[t]he fact that an old release and/or statement of restrictions relating to Matanic's 2003 back surgery would have sufficed to clear Matanic for employment as a process engineer underscores that no individualized assessment of Matanic's ability to perform the essential functions of the position was required by ATM or sought by Lakeside." (Dkt. 67 at 21)

ATM argues that the "assessment done for Matanic was individualized, as is every assessment done by Lakeside," and that to the extent it was not, "Dr. Gwyn could not perform the evaluation necessary because Matanic failed to provide documentation or, in the alternative, a functional capacity test, to give her the necessary information she needed in order to conduct that test and to provide ATM with the medical clearance." (Dkt. 74 at 18-19)

The parties have stipulated that "Lakeside did not request and ATM did not provide job descriptions as part of the pre-employment examination process," and "Lakeside did not have a copy of Matanic's job description, did not request one from ATM, and did not discuss Matanic's job functions with him."   (Dkt. 75 at ¶ 19, 36)   Indeed, Gwyn testified as follows:

> Q Did you ever do an on-site walk-through at American Tool & Mold?
>
> A No.
>
> Q Do you know what functions are performed at American Tool & Mold?
>
> A No.
>
> Q Do you know what Mr. Matanic's job was at American Tool & Mold?
>
> A He said he was going for the position engineer.
>
> Q Do you know what the engineer at American Tool & Mold does?
>
> A No.

(Dkt. 67-21 at 77)   Thus, ATM's argument that an individualized assessment was made as to Matanic's ability to perform the essential functions of the position is belied by the record evidence, which establishes that Gwyn was not even aware of what the essential

functions were.   Furthermore, while it was Gwyn who made the final determination that Matanic was not fit for duty, she was not the person who performed the actual physical examination nor was she even present when it occurred; rather, Steven Yeager performed the exam.   (Dkt. 75 at ¶¶ 33-35; 67-21 at 46-49, 74-75, 81)

ATM cannot avoid its obligations to evaluate Matanic's actual ability to perform the job, "by blindly relying on the assessment of" Lakeside, especially in light of the undisputed record evidence that Lakeside's examination could not have been, as a matter of law or logic, an individualized assessment that accounted for the essential functions of the position.   Rodriguez, 436 F.3d at 484.

ATM's alternative argument likewise is unavailing.   In the absence of an individualized assessment, the fact that Lakeside unconditionally refused to perform the back screening shows that it, and thus ATM, regarded Matanic as disabled without any basis therefore, apart from the bare knowledge that he once underwent back surgery.

To the extent one could argue that obtaining the release/restriction was an independent "exclusionary criteria," ATM has not identified any "job-related" criteria consistent with a "business necessity," as required by 29 C.F.R. § 1630.14(b)(3), that would justify the additional obligation.   The only readily apparent reasons for the additional requirement of producing the 2003 records is perhaps to dispel a fear of additional worker's compensation claims or potential future injuries to Matanic; however, neither of those are permissible justifications under the ADA.   See, e.g., Garrison v. Baker Hughes Oilfield Operations, Inc., 287 F.3d 955, 960-61 (10th Cir. 2002) (finding that withdrawal of job offer after learning of multiple prior worker's compensation claims and "unsubstantiated speculation about future risks from a perceived disability" was

impermissible because the "results of a medical inquiry or examination may not be used to disqualify persons who are currently able to perform the essential functions of a job, either with or without an accommodation, because of fear or speculation that a disability may indicate a greater risk of future injury, or absenteeism, or may cause future workers' compensation or insurance costs"); Lentos v. Hawkins Const. Co., 20 A.D. Cases 145, at *11 (D. Neb. Nov. 7, 2007) ("[P]laintiff has established that there are genuine issues as to whether the defendant's inquiry into the plaintiff's 2003 medical records violated § 12112(d)(3)(A) and as to whether he was capable of performing the concrete finisher position in April 2006. He has also submitted evidence that Pope told him that the employment offer was withdrawn because of the plaintiff's past injuries and because he believed the plaintiff to be disabled.").

Thus, the Court finds that Lakeside did not perform an individualized assessment of Matanic's ability to perform the essential functions of the position. Consequently, the withdrawal of the offer of employment could not have been the result of an individualized determination that revealed an impairment that would have precluded Matanic from performing the essential functions of the position, and thus violated 29 C.F.R. § 1630.14(b)(3). Nor has ATM articulated an independent "job-related" criteria consistent with a "business necessity," that would justify the additional requirement placed on Matanic of producing the 2003 records, in the absence of the individualized determination that would show the records were needed.

### d. Direct Threat

The conclusion that no individualized assessment occurred likewise forecloses the "direct threat" defense often asserted by employers in these cases. Under the ADA, it is

a defense to a charge of discrimination that a "qualification standard," which tends to "screen out or otherwise deny a job or benefit to an individual with a disability has been shown to be job-related and consistent with business necessity."   42 U.S.C. § 12113(a). "The term 'qualification standard' may include a requirement that an individual shall not pose a direct threat to the health or safety of the individual or others in the workplace." 29 C.F.R. § 1630.15(b)(2); see also 42 U.S.C. § 12113(b) ("'[Q]ualification standards' may include a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace.").   "Direct Threat means a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation."   29 C.F.R. § 1630.2(r); see also 42 U.S.C. § 12111(3) ("'[D]irect threat' means a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation.").   Importantly, however, "[t]he determination that an individual poses a 'direct threat' shall be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job."   29 C.F.R. § 1630.2(r); see also Chevron U.S.A. Inc. v. Echazabal, 536 U.S. 73, 86 (2002) ("The direct threat defense must be 'based on a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence,' and upon an expressly 'individualized assessment of the individual's present ability to safely perform the essential functions of the job,' reached after considering, among other things, the imminence of the risk and the severity of the harm portended.") (quoting 29 CFR § 1630.2(r) (2001)).

Because an individualized assessment was not performed here, ATM cannot avail itself of this defense.

Moreover, ATM's response on this issue again highlights its unsubstantiated fear regarding Matanic's perceived disability: "It is unreasonable for EEOC to take the position that ATM should have allowed Matanic to work without knowing his ability, disability, or if Matanic required any form of accommodation and that ATM should just blindly place him in a machine shop and hope that he doesn't injure himself."   (Dkt. 74 at 19)   There is no need for ATM to simply "hope" that Matanic does not injure himself.   Rather, it could have had an individualized assessment of his abilities to perform the functions of the job performed.   In the absence of such an examination, however, ATM cannot rely on "myths and fears" regarding whether a back surgery performed years earlier might "place ATM at risk of potential liability and possibly cause harm or irreparable harm to [Matanic]," (Dkt. 67-7 at 2), because that is precisely what the ADA generally, and the "regarded as" prong specifically, were designed to prevent. <u>Sch. Bd. of Nassau County, Fla. v. Arline</u>, 480 U.S. 273, 284 (1987) ("By amending the definition of 'handicapped individual' to include . . . those who are regarded as impaired . . . Congress acknowledged that society's accumulated myths and fears about disability and disease are as handicapping as are the physical limitations that flow from actual impairment.").

### e.  Issues Remaining for Trial

In light of the Court's determinations above, the only issues remaining for trial appear to be what damages or other remedies are appropriate in this matter and, relatedly, whether ATM can establish an after-acquired evidence defense to reduce those damages, and whether the injunctive relief that the EEOC has also sought should be granted.   The Court notes that Plaintiffs have filed a Motion for a Brief Telephonic Status Conference to address the pending motions, and several other procedural issues. (Dkt.

124). That motion is **GRANTED**.   In addition to the topics identified in the motion, the parties should be prepared to discuss what issues remain for trial in light of the Court's Order, how many trial days they foresee this matter requiring now that many of the disputed issues have been resolved, the effect of this Order on the pending motions *in limine*, and any other pending motions.   The Telephonic Status Conference will be set by separate notice.

## V.   CONCLUSION

Upon consideration of the foregoing, it is hereby **ORDERED** that the EEOC's Motion for Summary Judgment (Dkt. 67) and Matanic's Motion for Summary Judgment (Dkt. 68) are **GRANTED**. Plaintiffs Motion for a Brief Telephonic Status Conference (Dkt. 124) is also **GRANTED**.

**DONE** and **ORDERED** in Tampa, Florida, this 16th day of April, 2014.

MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE

**Copies furnished to:**
Counsel of Record
Any Unrepresented Person